# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| Timothy Engh, | ) | |
| | ) | |
| Plaintiff, | ) | Case No: 4:13-cv-34 |
| | ) | |
| vs. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| LEAM Drilling Systems, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff Timothy Engh brought this action against defendant LEAM Drilling Systems, LLC ("LEAM") for racial discrimination related to his involuntary termination of employment from LEAM. (Doc. #1). LEAM filed a motion for summary judgment. (Doc. #20). The motion for summary judgment has been fully briefed by the parties.

## **Factual Background**

LEAM Drilling Systems, LLC is a Louisiana foreign limited liability company licensed and doing business in North Dakota. (Doc. #1). LEAM performs *inter alia* measurement-while-drilling ("MWD") surveying in oil and gas fields. (Price's Dep., Doc. #36-1, p. 25, lns. 23-24). Timothy Engh, who is half Korean (Doc. #1; Engh's Dep., Doc. #36-7, pgs. 31-32), began working for LEAM as a MWD trainee on January 1, 2011.[1] (Doc. #1; Engh's Dep., Doc. #36-7, p. 42). MWD trainees at LEAM undergo an initial 90-day probationary period[2] in the position of night hand. (Dault's Dep., Doc. #36-2, p. 47, lns. 8-20). LEAM notes the evaluation period not only encompasses reviewing the trainee's ability to perform the MWD job but the company also

---

[1] When LEAM hired Engh, he had one month of oil field experience as a floor hand on an oil rig. (Engh's Dep., Doc. #36-7, pgs. 25-26, 41).

[2] Engh understood that the first few months of his employment with LEAM served as a probationary period to determine whether both LEAM and Engh liked the partnership. (Engh's Dep., Doc. #36-7, p. 86, lns. 1-12).

evaluates the trainee's ability to adjust to the working conditions including, but not limited to, the trainee's ability to live and work in close quarters, in remote locations, away from home and family, and for 12-hour shifts. (Id.; Bradley's Dep., Doc. #36-6, pgs. 32-33). During the 90-day period MWD trainees work on rigs and are supervised and mentored by lead hands. (Bedard's Dep., Doc. #36-3, pgs. 11-12; Exh. B, Doc. 36-19). After a trainee has completed his or her tour on a rig, the lead hand completes an assessment of the trainee's performance and emails that assessment to the regional coordinator and upper management at LEAM headquarters. (Exh. C, Doc. #36-20; Exh. B, Doc. 36-19). According to LEAM's internal documents circulated throughout the company, "Field Assessments are about 1/3 of what is considered" when deciding whether to terminate a trainee and LEAM does not "base any decisions on someone's progression, solely relying on one field assessment." (Exh. B, Doc. 36-19). On the other hand, Ortenzio (Otto) Sticca, who assisted Chris Price with operations coordination in North Dakota, testified the lead hands are the primary source of information for evaluating a trainee. (Sticca's Dep., Doc. #36-5, p. 49). In addition to emailing field assessments, lead hands would discuss trainees with their regional coordinators via telephone. (Bedard's Dep., Doc. #36-3, pgs. 27-28).

Engh worked on three different rigs during his approximately two-month employment with LEAM. (Engh's Dep., Doc. #36-7, p. 44, lns. 6-15). Quinn Dallman was Engh's lead hand on the first rig, Jaysun Bedard was Engh's lead hand on the second rig, and Wes Lindsey was Engh's lead hand on the third rig. (See Dallman's Dep., Doc. #36-9, p. 14, lns. 19-24; Engh's Dep., Doc. #36-7, p. 54, lns. 6-9; Lindsey's Assessment, Doc. #36-15; Dallman's Assessment, Doc. #36-12; Bedard's Assessment, Doc. #36-14). Engh asserts Dallman's and Lindsey's assessments of him were positive. (Doc. #37, pgs. 6, 8-9). Specifically, Engh contends Dallman gave him a "glowing review," rating him as "exceptional" or "exceeds requirements" in 12 of the

2

13 evaluation categories, and noted Lindsey's assessment was a strong evaluation as well.[3] (Doc. #37, p. 6, 8-9). However, in his deposition, Dallman claimed his field assessment of Engh may appear to be positive but "there's more than meets the eyes" and that he "embellished [the assessment] to make Tim look good." (Dallman's Dep., Doc. #36-9, pgs. 19-20). Lindsey commented that he was "[m]aybe a little bit" surprised that Engh was fired but that he "had heard that [Engh] had problems [affecting his work]."[4] (Doc. #21-14, p. 7, Lindsey's Dep., p. 29).

Bedard did not give Engh a positive field assessment. Bedard rated Engh as "marginal" or "unsatisfactory"[5] in 9 out of the 13 categories. (Bedard's Assessment, Doc. #36-14, p. 1). Bedard listed the following as Engh's weaknesses: "Falling asleep on tower (in his room), Missing surveys on his tower, Constantly on FaceBook [sic], Constant[l]y wants to go home, Constant[l]y wants his wife to come out (she's surprisingly hot), Wears same clothing and smells like a geologist."[6] (Bedard's Assessment, Doc. #36-14, p. 2). Further, Bedard stated Engh needed improvement on "[a]ll around everything." (Bedard's Assessment, Doc. #36-14, p. 2). In his

---

[3] Lindsey's review is dated March 11, 2011, which is four days after Engh was terminated. (See Lindsey's Assessment, Doc. #36-15; Bradley's Dep., Doc. #36-6, p. 56).

[4] Lindsey elaborated further, stating he had heard from other directional drillers and had seen for himself that Engh had problems on the rig. (Doc. #21-14, p. 7, Lindsey's Dep., p. 29). Specifically Lindsey commented, "[Engh's] a good guy and, with time, I think he could have been a good hand. He just wasn't the type of person that I'd want to work with in the future, you know. Although I let his wife come out on location, those problems need to stay at home. You know, work is work; home is home." Id. at p. 34, lns. 14-18.

[5] Out of a 5 point scale on which 1 is the lowest and 5 is the highest, the ratings of "unsatisfactory" and "marginal" equate to a 1 and 2 respectively. (Lindsey's Assessment, Doc. #36-15; Dallman's Assessment, Doc. #36-12; Bedard's Assessment, Doc. #36-14).

[6] Bedard explained this comment in his deposition, stating, "[G]eologists have kind of a funk to them of chemicals. . . . [I]f we work an invert and you don't change your clothing or do that . . . this is kind of a known thing, if you work with a geologist, you'll never forget [the smell]." (Bedard's Dep., Doc. #36-3, p. 38).

3

deposition, Bedard asserted his field assessment was "actually pretty accurate and pretty fair." (Bedard's Dep., Doc. #36-3, p. 44). In their depositions, Lindsey and Bedard acknowledged they did not possess the authority to hire or fire employees, including Engh. (Doc. #21-14, p. 7, Lindsey's Dep., p. 24, lns. 19-21; Bedard's Dep., Doc. #36-3, p. 64, lns. 3-8).

The court notes that in addition to submitting field assessments, Bedard and Dallman contacted their regional coordinator, Chris Price, to discuss the work-related problems they had with Engh. (Dallman's Dep., Doc. #36-9, p. 21, lns. 1-6; Bedard's Dep., Doc. #36-3, pgs. 26-27). Dallman stated, "The only thing I ever said to Chris Price was - - when Chris Price was asking me about [Engh] that [Engh] had a lot of personal problems that were affecting his work and that maybe somebody else should try being his lead hand, you know, give him another chance." (Dallman's Dep., Doc. #36-9, p. 21, lns. 1-6). Bedard thinks he called Chris Price about one incident because he was "very upset" that while he was hanging up on a harness fixing a rig tool, Engh left him to go sit by a heater, which presented a safety issue. (See Bedard's Dep., Doc. #36-3, pgs. 23-24, 26-27).

At the time Engh worked for Bedard, he "just figured [Bedard] didn't like [him]." (Engh's Dep., Doc. #36-7, p. 73, lns. 2-8). However, after his termination Engh saw a Facebook post in which Bedard stated, "we had a jap work here? fired him." Engh, believing Bedard was referencing him in the post, concluded Bedard intentionally wrote a negative field assessment to get him fired because he was Asian.[7] (Facebook post, Doc. #36-13, p. 3; Doc. #37, p. 8, fn. 8; see also Engh's Dep., Doc. #36-7, pgs. 72, 139, 148, 172). Engh asserts Bedard knew he was half

---

[7] The Facebook posts were made in connection with Dallman's comment regarding Honda's advertisement during the NCAA basketball tournament seeking donations for relief to help victims of the tsunami in 2011. (Facebook post, Doc. #36-13). In this Facebook post Bedard also stated, "well all I know is god hates [japanese people]" and "god hates the japs thats why they gave them that bad ass surfing wave." (Facebook post, Doc. #36-13, pgs. 3-4).

Korean[8] and made racially charged comments[9] about him while working together including that Engh was good at math, had an odd skin color, and had slanty eyes.[10] (Engh's Dep., Doc. #36-7, pgs. 58, 63, 149; Michelle Engh's Dep., Doc. #36-10, pgs. 17-18). Engh concedes that he did not hear any racist comments directed at him during his tours on the first or third rigs or during his interactions with any other LEAM employee. (Engh's Dep., Doc. #36-7, pgs. 53, 56, 60). Engh did not report Bedard's allegedly racially discriminatory comments to LEAM and contends LEAM did not have a formal system established for reporting complaints. (Engh's Dep., Doc. #36-7, pgs. 77-78, 185).

LEAM terminated Engh's employment on March 7, 2011, (Doc. #21-2, p. 2), listing "Poor Job Performance" as the reason for the termination. (Doc. #21-2, p. 3). Price testified that he, Donnie Dault, and Scott Bradley made the decision to terminate Engh. (Price's Dep., Doc. #36-1, p. 23, lns. 18-20). Bradley, vice-president of operations, testified that he made the ultimate decision to fire Engh. (Bradley's Dep., Doc. #36-6, p. 87). Donnie Dault, who served as MWD operations manager, met Engh only once and noted at the time Engh's disheveled appearance and the fact that he drove a minivan, an unusual vehicle for the North Dakota oilfields, which appeared as though Engh lived in it. (Dault's Dep., Doc. # 36-2, pg. 15-16). He encouraged Chris Price, the regional operations coordinator, to make sure field hands had a "professional appearance" as a factor in evaluating employees. (Id. at 19).

Chris Price had his own issues with Engh. He did not like the fact that Engh's minivan

---

[8] In his deposition, Bedard testified he did not know Engh was Asian but rather presumed he was Caucasian. (Bedard's Dep., Doc. #36-3, pgs. 48-49).

[9] Engh also alleged Bedard "used the 'N' word a lot" and he bragged about getting a "lazy Indian" fired. (Engh's Dep., Doc. #36-7, pgs. 66-69).

[10] Engh claimed Bedard also said he smelled bad but admitted that this comment was not necessarily racial in nature. (Engh's Dep., Doc. #36-7, p. 70).

5

was not reliable transportation for hauling tools. He noted, "It was just always a question, which I needed something done work-wise the car wasn't ready to go or it couldn't perform," which impacted the company's performance. (Price's Dep., Doc. #36-1, p. 29). Yet, Price observed that Engh "was able to make it back to his house somehow." Id. Also, Bedard had likely reported to Price the incident in which Engh left to stand by a heater while Bedard was suspended in a harness. (Bedard's Dep., Doc. #36-3, pgs. 23-24, 26-27). Price had mentioned to Donnie Dault an incident on a rig involving Engh that did not reflect well on the company. (Dault's Dep., Doc. #36-2, p. 26). It is not clear whether this was the same incident described by Bedard.

Engh wrote a follow-up email to Dault following his termination inquiring as to the reason his employment was terminated.[11] (Engh/Dault emails, Doc. #21-4). Dault responded,

> The decision was made based on 'Fit' to the organization and development. Both were in question in our eyes and that's what drove the decision. Chris [Price] and Otto [Sticca] both have noted that you were progressing, we just didn't believe it was as fast as some of the other Trainees we currently have in the organization.

(Engh/Dault emails, Doc. #21-4, p. 1). Dault elaborated further in his deposition on LEAM's decision to terminate Engh, citing negative feedback about Engh from the regional coordinators and Engh's disheveled appearance as factors for terminating Engh's employment. (Dault's Dep., Doc. #36-2, pgs. 26-29, 38). Dault also stated he did not speak to Bedard about Engh. (Dault's Dep., Doc. #36-2, p. 34, lns. 4-9). In his deposition Bradley acknowledged it was his ultimate decision to terminate Engh[12] and explained,

---

[11] Dault spoke with other companies about employment opportunities for Engh and offered to put Engh into contact with those companies. (Engh/Dault emails, Doc. #21-4, p. 1).

[12] Bradley commented that he generally did not make the ultimate decision to terminate employees but rather that it's a group decision in which upper management reviews a spreadsheet of a list of names with date of hire, organization, etc. and collectively discusses which employees to promote and terminate. (See Bradley's Dep., Doc. #36-6, pgs. 37-40).

> There were a number of people in North Dakota that we were going to dismiss from the company, and the determination had been made in a prior review meeting that we were going to terminate X number of people.[13] And when I saw information come through,[14] and I don't recall what the information was, whether it was an employee list or what, I responded and said terminate [Engh] immediately, why hasn't this been done. And then it took seven more days to get that done.

(Bradley's Dep., Doc. #36-6, pgs. 87-88; see Bradley's email, Doc. #36-16). Bradley further stated he does not recall seeing the field assessments[15] of Engh prior to making the decision to terminate him but rather relied on the comments he had received from Dault and Price.[16] (Bradley's Dep., Doc. #36-6, pgs. 88-90). LEAM maintains it properly terminated Engh's employment for poor job performance. (Doc. #21, p. 30).

---

[13] Bradley stated, "If we hire ten MWD hands, we expect we're doing well if a third of them stick around, be it through their own attrition, they get on location and realize they don't like it, or we realize they're not a fit for the organization. In North Dakota, at the time, the management team, which I can tell you that was myself, Mr. Dault, maybe a few other people at the time, were very frustrated with the North Dakota operation because we were a hundred percent successful with – with hiring, so to speak. We had hired a number of trainees in the marketplace over the last six months – and a hundred percent may be a little off because I'm sure a few people quit. But we had not terminated any employees for poor performance or any – any issues whatsoever in North Dakota, to my knowledge. I was very frustrated at our – the management policies that we had in place, that we weren't actively trying to increase the aptitude and quality of the personnel that we had on location." (Bradley's Dep., Doc. #36-6, pgs. 35-36).

[14] At one point in his deposition Bradley stated he didn't have knowledge of "information sent to the company" about Engh other than the field assessments, although he explained the assessments were "just one part of the puzzle" in the decision to terminate a trainee. (Bradley Dep., Doc. #36-6, pgs. 28-29) At a later point in his testimony Bradley stated he relied on comments made by Dault and Price about Engh's appearance and performance in deciding to terminate Engh. (Id. at pg. 89). It appears Bradley did not consider Dault and Price's comments to him to be "information sent to the company," as opposed to the written field assessments submitted by the lead hands.

[15] In his deposition, Bradley asserted that field assessments are "just one part of the puzzle" in evaluating a LEAM employee for termination or promotion. (Bradley's Dep., Doc. #36-6, p. 29).

[16] Bradley noted that Dault's and Price's comments stemmed from their communication with Bedard, Dallman, and Engh himself. (Bradley's Dep., Doc. #36-6, p. 89).

**Legal Standard**

Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is "material" if it might affect the outcome of a case, and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986). Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." Celotex, 477 U.S. at 322.

The burden is on the moving party to establish the basis for its motion. Donovan v. Harrah's Md. Heights Corp., 289 F.3d 527, 529 (8th Cir. 2002). If the moving party has supported its motion for summary judgment, the nonmoving party has an affirmative burden to go beyond the pleadings and show a genuine triable issue of fact. Commercial Union Ins. Co. v. Schmidt, 967 F.2d 270, 271 (8th Cir. 1992). The court views the facts in the light most favorable to the nonmoving party, who enjoys "the benefit of all reasonable inferences to be drawn from the facts." Vacca v. Viacom Broadcasting of Missouri, Inc., 875 F.2d 1337, 1339 (8th Cir. 1989) (citation omitted).

**Discussion**

**1. Title VII of the Civil Rights Act of 1964**

Engh asserts LEAM fired him as a result of Bedard's racially-motivated, negative field assessment. (Docs. #1, 37). Under Title VII of the Civil Rights Act of 1964, an employer is prohibited from discharging an individual because of his race or national origin. 42 U.S.C. § 2000e-2(a)(1); Vance v. Ball State University, 133 S.Ct. 2434, 2440 , 186 L.Ed.2d 565 (2013). Engh may survive LEAM's motion for summary judgment in one of two ways. McCullough v.

8

Univ. of Ark. For Med. Scis., 559 F.3d 855, 860 (8th Cir. 2009). First, Engh may "present admissible evidence directly indicating unlawful discrimination." Young v. Builders Steel Co., 754 F.3d 573, 577 (8th Cir.2014)(citing Humphries v. Pulaski Cnty. Special Sch. Dist., 580 F.3d 688, 692 (8th Cir.2009)). Alternatively, Engh may create an inference of discrimination under the burden-shifting framework established in McDonnell Douglas Corp. V. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Engh has presented no direct evidence of race discrimination[17] so the court must decide if Engh has presented evidence that creates an inference of discrimination.

**(A) Prima Facie Case**

To establish a prima facie case of race discrimination, Engh "must show (1) he is a member of a protected class, (2) he met his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination (for example, similarly situated employees outside the protected class were treated differently)." Gibson v. Am. Greetings Corp., 670 F.3d 844, 853-54 (8th Cir.2012)(citing

---

[17] Direct evidence, in the context of employment discriminations actions, "is not the converse of circumstantial evidence . . . [r]ather, direct evidence is evidence 'showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated' the adverse employment action." Torgerson v. City of Rochester, 643 F.3d 1031, 1044 (8th Cir.2011)(quoting Thomas v. First Nat'l Bank of Wynne, 111 F.3d 64, 66 (8th Cir.1997). "Such evidence must be 'strong' and must 'clearly point[] to the presence of an illegal motive' for the adverse action." Bone v. G4S Youth Services, LLC, 686 F.3d 948, 853 (8th Cir.2012)(citing Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir.2004)). The court notes "stray remarks in the workplace" and "statements made by nondecisionmakers" do not constitute direct evidence. Moody v. Vozel, 771 F.3d 1093, 1096 (8th Cir.2014)(quoting Radabaugh v. Zip Feed Mills, Inc., 997 F.2d 444, 449 (8th Cir.1993)). Engh does not explicitly state in his motion response that there is direct evidence of discrimination. (See Doc. #37). However, even if Engh contends Bedard's Facebook and other allegedly derogatory remarks constitute direct evidence, such comments would be considered "stray remarks" made by a "nondecisionmaker" and therefore not direct evidence.

Lake v. Yellow Transp., Inc., 596 F.3d 871, 874 (8th Cir.2010)). It is undisputed that Engh is a member of a protected class and that he suffered an adverse employment action.

LEAM cited poor job performance as the reason for Engh's employment termination, listing Engh's poor work ethic, falling asleep on the job, breaking tools, requesting to go home and bringing his wife to rig locations as indications of poor job performance warranting employment termination. (Docs. #21, 21-2, p. 3). However, Engh contends he was meeting LEAM's legitimate expectations as demonstrated by the positive field assessments he received from two out of his three lead hand supervisors, Dallman and Lindsey. (Docs. #1, 37). In his deposition, Dallman recanted the positive field assessment he gave Engh, stating that he would consider Engh to be "marginal" overall and that he "embellished [the assessment] to make Tim look good." (Dallman's Dep., Doc. #36-9, pgs. 19-20). Although Lindsey admitted he rated "everybody about the same," he also acknowledged that Engh was "very capable of doing the job." (Doc. #21-14, p. 6, Lindsey's Dep., pgs. 17-18). All three lead hands noted Engh's home life as a weakness on which he needed to improve, specifically referencing Engh bringing his wife on the rig. (Doc. #21-14, p. 9, Lindsey's Dep., pgs. 29-32; Bedard's Assessment, Doc. #36-14, p. 2; Dallman's assessment, Doc. #36-12, p. 3). While Bedard and Lindsey acknowledged permitting Engh's wife to visit the rig during Engh's tour was likely prohibited, they both gave Engh permission for his wife's visits. (Doc. #21-14, p. 9, Lindsey's Dep., p. 32, lns. 9-14; Bedard's Dep., Doc. #36-3, p. 25, lns 12-17). Further, in response to Bedard citing Engh as "falling asleep on to[u]r," Engh admitted that he "maybe doz[ed] off once" but that he had been "up for four days" fixing a problem on the rig. (Bedard's Assessment, Doc. #36-14, p. 2; Engh's Dep., Doc. #36-7, pgs. 82-83). The court notes several factual inconsistencies regarding whether Engh met LEAM's legitimate work expectations and therefore assumes, without deciding, this element is suitable for a jury to decide.

The final element Engh must show to establish a prima facie case for race discrimination is that LEAM did not terminate employees who were similarly situated to him. "The test for whether employees are similarly situated 'is rigorous and requires that the other employees be similarly situated in all relevant aspects before the plaintiff can introduce evidence comparing [himself] to the other employees.'" Davis, 685 at 681(quoting Fields v. Shelter Mut. Ins. Co., 520 F.3d 859, 864 (8th Cir.2008)). Specifically, "[t]he individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and [have] engaged in the same conduct without any mitigating or distinguishing circumstances." Davis, 685 at 681(quoting Morgan v. A.G. Edwards & Sons, Inc., 486 F.3d 1034, 1043 (8th Cir.2007)).

In his brief, Engh lists seventeen individuals allegedly similarly situated to Engh whom Engh submits were "borderline incompetent Caucasian trainees" yet LEAM retained them as employees. (Doc. #37, pgs. 10-13). After reviewing the assessments, the court notes that none of the selected[18] employee field assessments were completed by any of the three lead hands who evaluated Engh.[19] Id. Further, none of LEAM's assessments ever indicate the race or national origin of the employee under evaluation. (See Field Assessments, Docs. #36-11, 36-37, 26-42, 36-45). Lastly, there are no field assessments that match all, or even most, of Engh's allegedly unacceptable work conduct because each assessment contains individualized comments.[20] Id.

---

[18] In addition to the seventeen field assessments of individuals Engh asserted to be similarly situated to himself, Engh also provided additional field assessments of other employees written by Lindsey and Dallman. While these latter evaluation scores are similar to those given to Engh, the contents in the comment boxes do not match those in Engh's evaluations. (Docs. #36-30, 36-41).

[19] Not only are the field assessments of these seventeen LEAM employees not recorded by Engh's immediate lead hand supervisors but the record is also unclear as to which LEAM upper management staff members were involved in the process of making the employment decisions for those particular individuals.

[20] The court notes there are some field assessments that identify a weakness similar to Engh's, including breaking a tool and being homesick, but Engh does not identify a trainee that

Accordingly, Engh fails to identify similarly situated employees that were identified as having the same performance issues but were not terminated, and therefore fails to satisfy the fourth element required for making a prima facie case of race discrimination.

**(B) Pretext**

Assuming *arguendo* that Engh has succeeded in making a prima facie case of race discrimination then under McDonnell Douglas the burden shifts to LEAM to articulate a legitimate, non-discriminatory reason for Engh's employment termination. McDonnell, 411 U.S. at 802; Young, 754 F.3d at 578 (citing Davis v. Jefferson Hosp. Ass'n, 685 F.3d 675, 681 (8th Cir.2012)). This burden is not onerous and LEAM has satisfied this requirement by stating it terminated Engh's employment for "Poor Job Performance." (Doc. #21-2, p. 3; see Bone, 686 F.3d at 954 (citing Rodgers v. U.S. Bank, N.A., 417 F.3d 845, 853 (8th Cir.2000)). Since LEAM met its burden, "the presumption of discrimination disappears, and [Engh] is required to prove the proffered justification is merely a pretext for discrimination." Bone, 686 F.3d at 954 (citing Pope v. ESA Servs., Inc., 406 F.3d 1001, 1007 (8th Cir.2005)). An employee may demonstrate pretext by: (1) showing that the employer's explanation has no basis in fact; or (2) persuading the court that a prohibited reason more likely motivated the employer. Torgerson v. City of Rochester, 643 F.3d 1031, 1044 (8th Cir.2011).

As discussed above, LEAM contends it terminated Engh's employment for poor job performance. (Docs. #21, 22-2). All three of Engh's immediate lead hand supervisors commented on his personal problems affecting the quality of his work. (Doc. #21-14, p. 7, Lindsey's Dep., p. 29; Bedard's Assessment, Doc. #36-14, p. 2; Dallman's Dep., Doc. #36-9, p. 21, lns. 1-6). While Engh submits his actions were justified, he does concede he fell asleep at

---

had all, or even most, of the work problems for which Engh was allegedly terminated. (Doc. #37, p. 11-12).

work once and had his wife out on the rig, which are implicitly unacceptable work behaviors.[21] (Doc. #36-7, pgs. 82-83; Bedard's Assessment, Doc. #36-14, p. 2). In addition, two of the three members of the management team who made the decision to fire Engh identified their own issues with his performance. (Dault's Dep., Doc. #36-2, p.gs. 15-16, 26; Price's Dep., Doc. #36-3, pgs. 23-34, 26-27). While the court acknowledges there is a question of fact regarding the quality of Engh's work performance, the court finds LEAM's explanation for Engh's termination has some basis in fact and therefore Engh fails to meet the first requirement of pretext.

Alternatively, Engh asserts he was fired as a result of Bedard's racially motivated negative field assessment as opposed to his work performance. (Docs. #1, 37). Although Engh submits Bedard had bragged about firing a "lazy Indian," (see Engh's Dep., Doc. #36-7, pgs. 66-69) in their depositions LEAM employees – including Bedard – acknowledge that lead hands do not have the power to fire or hire trainees and that lead hand field assessments on a trainee are not the sole factor considered when evaluating whether or not to retain the trainee. (Exh. B, Doc. #36-19; Lindsey's Dep., Doc. #21-14, p. 7, Dep. p. 24, lns. 19-21; Bedard's Dep., Doc. #36-3, p. 64, lns. 3-8). Further, Engh admits he did not feel racial discrimination from any other employee at LEAM. (Engh's Dep., Doc. #36-7, pgs. 53, 56, 60). Therefore, Engh is unable to show the court that it is more likely LEAM fired him due to his race rather than poor job performance.

**2. North Dakota Human Rights Act**

Engh likewise cannot prevail on an employment discrimination action under North Dakota law. Similar to Title VII, The North Dakota Human Rights Act ("NDHRA") prohibits discrimination based on *inter alia* race or national origin and requires the plaintiff to prove: "(1)

---

[21] The court notes LEAM did not have formal written policies about bringing non-employees out to the job site but that overall it was frowned upon by upper management. (Doc. #21-14, p. 9, Lindsey's Dep., p. 32, lns. 9-14; Bedard's Dep., Doc. #36-3, p. 25, lns 12-17).

membership in a protected class under the Act; (2) satisfactory performance of the duties of the position; (3) an adverse employment decision; and (4) others not in the protected class were treated more favorably." See N.D.C.C. § 14.02.4-03; Jacob v. Nodak Mut. Ins. Co., 2005 N.D. 56, ¶ 13, 693 N.W.2d 604.609 (See also Spratt v. MDU Resources Group, Inc., 2011 N.D. 94 ¶¶ 5, 10, 797 N.W.2d 328, 330 (The North Dakota Supreme Court "has adopted a modified version of the federal McDonnell Douglas formula, which creates a presumption and burden of proof in employment discrimination cases.")). For the reasons discussed above, Engh fails to satisfy the fourth element under NDHRA requiring a showing that others not in Engh's protected class were treated more favorably.

## Conclusion

Defendant is entitled to summary judgment because Engh has failed to establish that his employment with LEAM was terminated based on his race or national origin, under either Title VII or The North Dakota Human Rights Act. Accordingly, it is **RECOMMENDED** defendant's motion for summary judgment (Doc. #20) be **GRANTED** and Engh's complaint (Doc. #1) be **DISMISSED** with prejudice.

Dated this 31st day of December, 2014.

    /s/ *Karen K. Klein*
    Karen K. Klein
    United States Magistrate Judge

## **NOTICE OF RIGHT TO OBJECT**

Pursuant to Rule 72(a) and (b), Federal Rules of Civil Procedure, and District of North Dakota Local Court Civil Rule 72.1(D)(2) and (3), any party may object to this Report and Recommendation by filing with the Clerk of Court no later than January 19, 2015, a pleading specifically identifying those portions of the Report and Recommendation to which objection is made and the basis of any objection. Failure to object or to comply with this procedure may forfeit the right to seek review in the Court of Appeals.